ADAM GORDON
United States Attorney
ASHLEY E. GOFF
SHIVANJALI SEWAK
California Bar Nos. 299737/329024
Assistant U.S. Attorneys
United States Attorney's Office
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-9735
Ashley.Goff@usdoj.gov/Shivanjali.Sewak@usdoj.gov

Attorneys for the United States

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>VICTOR LEE MARION JR. (1),<br>    aka "Vic,"<br>    aka "Peyami,"<br><br>Defendant. | Criminal Case No. 25CR4061-TWR-01<br><br>**UNITED STATES' MOTION TO DETAIN**<br><br>Date:    TBD<br>Time:    TBD |

The UNITED STATES OF AMERICA, by and through its counsel, hereby moves to detain defendant Victor MARION, aka Vic, aka Peyami ("MARION"), based on risk of flight and economic danger to the community. This motion is based on the files and records of this case and the facts proffered herein by the United States. In sum, MARION is an organizer of a transnational criminal organization who has travelled internationally to facilitate the fraud of predominantly elderly Americans. The foreign organization MARION works for is willing to (and has already) paid to relocate San Diego-based participants to "hide" from U.S. law enforcement in foreign countries. There is no condition or combination of conditions that could secure MARION's appearance at a future

trial and if released he poses an ongoing economic danger to the community. He should be detained.

## I.    NATURE OF THE OFFENSE

### A.    MARION Joined A Conspiracy That Has Defrauded Over 500 Elderly Americans of Approximately 40 Million Dollars.

This case arises out of an FBI Elder Justice Task Force investigation into an Indian call center scam targeting elderly individuals across the United States. The scheme operates from foreign countries—namely India, Thailand, and the United Arab Emirates (UAE)—and defrauds victims twice over: first through a technical support scam and then through a refund scam, as described below. The global scheme has been ongoing since at least July 2021 and utilized MARION to organize U.S.-based individuals in Southern California to receive millions of dollars of victim funds and immediately transfer the majority of them to overseas accounts controlled by foreign organizers of the scheme.

While the full scope of the victimization is still being uncovered, the FBI has obtained over 100,000 recorded calls with victims at just the technical support stage of the scam and has identified approximately 500 U.S. victims with over 40 million dollars in losses. The United States believes those numbers only represent a small fraction of the total number of victims and losses, given the known scope of the organization, the time period it has operated, and the fact that elder fraud is unfortunately under-reported by victims.

MARION maintained consistent and direct communication with the India and Dubai-based leaders of the transnational criminal organization (TCO), and MARION ran the TCO's San Diego-based money laundering cell since at least fall 2023. MARION used his business—Mecca Barbershop—to recruit money launderers into the organization and to consolidate victim funds that elderly individuals were tricked into mailing to coconspirators across San Diego and elsewhere. As the leader of the San Diego money laundering cell, MARION received a percentage (typically 5-10%) of the fraud funds that were laundered through almost all of the 20+ coconspirators working under his umbrella. As discussed below, MARION also helped some money launderers graduate to higher roles

in the organization, including by relocating abroad from San Diego to India and the UAE to continue engaging in the fraud scheme.

**B.    Overview Of The Fraud Scheme**

This fraud scheme is believed to be ongoing and operates in three distinct phases: (1) the Opener Phase (a tech support scam); (2) the Closer Phase (a refund scam); and (3) the Money Transmitter Phase (money laundering of refund scam proceeds to entities whose products are used to facilitate the scheme and transmission of funds back to oversees actors). Each phase is described below in general terms for background purposes, but the scheme occasionally varied its techniques.

a.    Phase I: Opener Phase

In the Opener Phase, a pop-up ad (or other unsolicited communication) appears on the victim's computer screen indicating a critical issue with the device and need to secure technical assistance. That pop-up ad directs the victim to an "Opener."  In this fraud scheme, the Opener purports to be a "tech support" professional—often a Microsoft employee—to gain the victim's trust and make them believe that they need immediate technical assistance, which leads to further manipulation and fraud. Many tech support victims express that they do not know that they have been victimized because they believe that they have received a legitimate product and/or service in exchange for their payment. The Opener often solicits a credit card or debit card payment for their technical support— that payment and the processing of it varies but tends to be a couple hundred dollars. The Openers schedule a callback time with the victim and transmit a "lead" to the "Closers" in furtherance of the next phase of the scheme where victims are defrauded of more substantial sums of money.

Through its investigation, the FBI has obtained over 100,000 recorded calls between Openers of this specific scheme purporting to be tech support professionals with actual victims. The FBI has reviewed multiple recordings and has confirmed that the Openers use a tech support scam to set up the victim for a call with the Closer.  The investigation to date

has confirmed that this elder fraud scheme has been ongoing since at least July 2021 and appears to be ongoing.

Several of the charged Defendants in this case made payments to the companies that hosted the virtual call platforms used by the Openers.

b.    Phase II: Closer Phase

At the completion of the technical support phase of the fraud scheme, the Openers generate a "lead" to the Closers and pass along the carefully collected victim information to the Closers. The Closers effectuate the refund portion of the fraud scheme by convincing victims that they have been over refunded and need to return sums of money. (For example, if the refund was supposed to be for $100, the Closer might convince the victim they added additional zeros to the refund form and were accidentally refunded $100,000.) Leads from Openers vary based on the level and type of victim interaction but generally include: name of the Opener; remote desktop software ID and password; victim name and contact information; victim banking information; victim family information; and a reason for the refund and the amount of the refund. After receiving the lead, the Closer uses the remote desktop software to manipulate the victims' screens to make it appear as if the victim received a substantially larger refund than they should have. This is done through directing the victim to use a remote desktop software so the Closer can view the victim's computer and manipulate the screen. With remote access secured, Closers employ a variety of social engineering techniques to convince the victim to send back the over-refunded money via cash, check, wire, and gift cards. In actuality, the manipulation of the screen inaccurately shows extra funds in the victims' accounts, when the Closer has actually moved the victim's own money from one of their accounts to another or edited the text of the html screen being viewed, showing an inflated amount or used a technique to make it appear the account has more money in it.

As further explained below, the Closers then direct the victim to send funds to money transmitters that are generally located in the United States, including the charged Defendants' money laundering cell located here in San Diego. The money transmitters

open fake businesses ("shell companies") and corresponding business bank accounts to receive and distribute the fraud funds from the refund portion of the scheme to companies that host that Openers' virtual call platforms and to other members of the conspiracy, including to bank accounts in India, UAE, and China.

c.   <u>Phase III: Money Transmitters</u>

In the final phase of the fraud scheme, money transmitters receive the victims' fraud funds in cash pickups, mailed cash, mailed checks, or by wire transfer to their accounts. Money transmitters had varying degrees of interaction with victims, from receipt of wires (sometimes with corresponding information about the victim (e.g., their identification)) in order to reassure the bank of the transfers' validity, to receipt of mailed cash packages, to personal pick-ups from victims. For example, in July 2025, as detailed in a complaint in support of his initial charges, codefendant Seth SHELDON picked up a victim, an elderly San Diego man, and drove him to multiple banks in San Diego after the victim was unsuccessful in wiring the fraud funds, unsuccessful in depositing the fraud funds by check, and blocked by bank staff from transferring the funds to SHELDON at the first bank branch; SHELDON personally took the victim to a second bank location where the victim transferred funds into SHELDON's shell company accounts before SHELDON withdrew his and his recruiters' cuts in cash and transferred the remainder of the victim's funds overseas. *See* Case No. 25MJ5319.

The money transmitters retain a portion of the fraud proceeds as their payment—often 10% to 20% to be divided between the account holder, their recruiter, and MARION—and transfer the majority of the remaining funds to accounts in the UAE, India, and China.

This scheme's money transmitters generally follow a consistent set of steps:

1. **Obtain a Shell Company:** Money transmitters did this by filing a Fictitious Business Name (FBN) statement at the San Diego County Recorder's Office or registering a Limited Liability Company with the California Secretary of State and obtaining an EIN from the IRS. The money transmitters' shell

companies did not appear to conduct any legitimate business—they often began receiving victim funds within days to a week of opening accounts and financial analysis of the shell accounts has not identified legitimate proceeds moving through any of the Defendants' shell companies' accounts.

2. **Open business bank accounts in the name of the shell company** for the purpose of receiving and distributing mail and wire fraud funds.

3. **Receive funds from victims** via check, wire transfer, and cash.

4. **Retain approximately 10% of victim funds as payment for maintaining the shell company and its accounts.**

5. **Provide approximately 10% of funds to their recruiter and MARION.**

6. **Send remaining funds to accounts controlled by coconspirators or the call platforms used to facilitate the scheme.**

Investigators are aware that foreign organizers of the scheme paid for numerous money transmitters, including MARION, to travel to Thailand to be recruited into higher levels of the scheme, including to become Closers. MARION also allowed money transmitters to graduate higher into the scheme by giving them a percentage of the fraud funds flowing through the accounts of anyone they recruited into the scheme.

**C.** **MARION And At Least Six Others Travelled from Southern California To Thailand To Personally "Scam" Vulnerable Americans On Behalf of the TCO**

As discussed above, MARION's TCO has displayed a willingness to relocate San Diego-based money transmitters to foreign locations in furtherance of the scheme. Specifically, the foreign leaders of the scheme offered San Diego-based money transmitters all expenses paid trips to Thailand in order for those money transmitters to take on more substantial roles in the organization, namely by becoming Closers. On these trips, the foreign leaders paid for business and first class flights and all other expenses, treated money transmitters lavishly, described the nature of the scheme in detail, had money transmitters shadow a Closer, brought them to a villa, and then—if the money transmitters agreed—

trained them for weeks on how to be Closers. Based on the investigation to date, the recruiting of these money transmitters is believed to have been advantageous to the India-based TCO because native American English speakers had a higher conversion rate in defrauding elderly Americans. The foreign leaders of the scheme allowed Closers to reside anywhere globally and need not be present in the United States.

The FBI has confirmed that approximately eight San Diego-based money transmitters (six of which are charged in the present case, including MARION) went to Thailand for this purpose. Other codefendants are believed to have been invited but had not taken a trip at the time of their arrests in this case. In fall 2024, MARION and five codefendants travelled to Thailand. MARION and these codefendants began their trip on stage at a Thai nightclub with foreign-based leaders of the scheme, where they danced with Thai club dancers and threw stacks of money—money made by defrauding elderly Americans—into the air and out into the crowd (left – MARION; middle – codefendant HERNANDEZ; right – codefendant LEWIS):



//
//
//
//
//
//

The foreign leaders of the organization also treated MARION and those codefendants to various high-end Thai tourist activities at the TCO's expense. For example, the FBI recovered photographs of two foreign organizers of the scheme, MARION (second from right), Lejarde, and codefendants LEWIS, ABDULBASIR, HERNANDEZ and HAMMOND petting tigers:



While in Thailand, MARION and the codefendants travelling with him agreed to be Closers for the scheme and personally defrauded elderly Americans for at least a period of time. The FBI recovered extensive communications between MARION, his codefendants in Thailand, and multiple foreign counterparts in which Openers' leads were provided to the group and phone numbers associated to the Defendants in the above tiger photo (as well as Defendant YI) finalized the fraud with live victims as Closers. Throughout that group chat, participants openly discussed the fraudulent nature of the scheme: "college daughter stopped by to visit and told Cx **it's a scam**" (10/1/2024); "Cx [customer] knew entire script word for word and **[k]new it was a scam**" (10/2/2024); "son in law said he **thinks it's a scam**" (10/3/2024); **customer is "yelling it's a scam"** (10/8/2024); "cx [customer] has dementia…[wife] argued saying it's a scam" (10/9/2024). MARION, for his part, retained the role of coordinator and provided updates on coconspirators' successes and praised his crew of San Diego-based money transmitters on their Closing activities.

In another set of communications between a number identified as belonging to codefendant HAMMOND and coconspirator Jerard Lejarde (charged elsewhere),

HAMMOND drafted a script for Closers to follow, complete with social engineering techniques to exploit the victim into sending money (8/30/2024):

> Ef Pitch
>
> Intro – He Mr. customer (optional) my name is _____ with (tech company) Refunds and cancellation department
>
> Hook – It looks like you have a pending refund of (X amount) and my job is to get that sorted for you *send refund form
>
> - Back and forth convince them to start refund (should be pretty easy since they previously inquired)
>
> Problem ( after I learn to use the software)
>
> (Act confused) did you enter 200 or 200.00, you did not put this number? Are you sure? It looks like it took 20000 and not 200 oh no this is bad, it sent 20000 and not 200, I have to call my manager in here right away give me one moment
>
> (quick hold 30-60 sec) wait what You didn't put 200.00???? Did you put 20 thousands
>
> Manager call – Call manager and they yell build a big problem and urgency, I'm sorry I'll get this fixed real get away, I can't lose this job (build sympathy, pain, and urgency from customer
>
> Close – paint the picture of everyone getting fucked if they don't listen to me,
>
> Bank – (after I learn the different options on how to get money) walk them through that process
>
> . . .

Two days later, Lejarde sent HAMMOND a WhatsApp message with a 15-item checklist of how to conduct Closer calls. It includes: "7. Manual refund"; "8. Guilt trip"; "10. Force cooperate"; "14. always tell the customer the reason for the btc, cashier's check and cash"; and ends with "15. DON'T ever let the customer hang up for whatever reason."

When MARION and his coconspirators returned to the United States, they continued to funnel the TCO's proceeds through their fake businesses to foreign bank accounts and elsewhere.

**D.    <u>MARION'S TCO Is Willing To Relocate (And Already Has Relocated) San Diego-Based Money Transmitters To Foreign Countries Beyond U.S. Law Enforcement's Reach</u>**

As discussed above, this TCO is willing to relocate its San Diego-based coconspirators to foreign countries (including, countries the TCO perceives as being outside the reach of U.S. law enforcement) where they can continue to fund their lifestyles using ongoing fraud proceeds from elderly Americans. That risk is not a hypothetical—it has already occurred. Lejarde, discussed above and charged separately in 25CR2513-TWR, was a lower-level San-Diego based money transmitter who travelled to Thailand with MARION, trained as a Closer, and ultimately relocated abroad to become a close associate of one of the leaders of the organization. Though Lejarde's family was (and continues to be) in San Diego, Lejarde planned not to return in order to avoid potential law enforcement activity. Evidence indicates that the TCO paid for Lejarde to travel to various foreign countries to operate the scheme. Among the work he performed was using a fake Dubai-based company to recruit and vet the English of Openers to expand the reach of the TCO's fraud and train new Openers.

//
//
//
//
//
//
//
//
//

In March 2025, the United States charged two San Diego-based money transmitters who worked closely with MARION (and Lejarde) with conspiracy to commit mail and wire fraud and conspiracy to commit money laundering for their participation in this scheme. *United States v. Abueg et al*, 25cr1112-TWR. Within days of their arrest, Lejarde (using his alias "Liam Crawford") messaged MARION (using his alias "Peyami") that he and others were moving to "hide":



Lejarde spent the time after the above messages continuing to facilitate the fraud from "hid[ing]" in Dubai and India, where the TCO funded his lifestyle.

## II.    ARGUMENTS IN SUPPORT OF UNITED STATES' MOTION FOR DETENTION

### A.    LEGAL PRINCIPLES

The Bail Reform Act authorizes and sets forth the procedures for a judicial officer to detain a person, pending trial, sentence, and appeal. 18 U.S.C. §§ 3141-3150. The Act requires the court to order a defendant detained pending trial if "no condition or combination of conditions will reasonably assure the appearance of the person as required…" 18 U.S.C. § 3142(e); *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991); *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985). The court has a duty to engage in a two-step inquiry before ordering a defendant to be detained pending trial. *See, e.g., United States v. Hollender*, 162 F.Supp.2d 261, 264 (S.D.N.Y. 2001); 18 U.S.C. § 3142(b) and (e). First,

the court must make a finding as to whether the defendant presents a "serious risk that such person will flee" if not detained. *Id.* at § 3142(f)(2)(A). Second, if the defendant is likely to flee, the court "must determine whether some set of conditions would sufficiently vitiate that risk." *Hollender*, 162 F.Supp.2d at 264; 18 U.S.C. § 3142(g).

The court will consider the factors set forth in § 3142(g), such as: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance to court proceedings; and (4) the nature and seriousness of the danger to any person or community that would be posed by the person's release. The circuit courts, including the Ninth Circuit, have recognized that "danger to the community" can be supported by a person's "economic danger"—the danger does not have to be physical in nature. *See United States v. Reynolds*, 956 F.2d 192, 192-93 (9th Cir. 1992) (danger to community may extend in some cases to pecuniary or economic harm); *United States v. Genry*, 455 F.Supp.2d 1018 (D. Ariz. 2006) (citing *Reynolds*); *United States v. Hoover,* 2014 WL 2094201 (D. Ariz., May 20, 2014) (unpublished) (detaining defendant based upon, among other factors, his economic danger to the community); *United States v. Possino*, 2013 WL 1415108 (C.D. Cal. April 8, 2013) (unpublished) (detaining the defendant as posing an economic danger due to the defendant's propensity for ongoing fraudulent activity); *United States v. Provenzano*, 605 F.2d 85, 95 (3rd Cir. 1979) (danger not limited to physical harm); *United States v. Jinwright*, 2010 WL 2926084 (W.D.N.C. July 23, 2010) (unpublished) (economic danger provides adequate basis for detention under the Bail Reform Act); *United States v. Madoff*, 586 F. Supp. 2d 240, 253 (S.D.N.Y. 2009) (jurisprudence supports "consideration of economic harm in the context of detention to protect the safety of the community"); *United States v. Harris*, 920 F. Supp. 132, 133 (D. Nev. 1996) (economic or pecuniary interests rather than physical ones are often most susceptible to repeated danger by released

defendant); *United States v. Williams*, 565 F. Supp. 350, 352 (N.D. Ill. 1983) (fact that community may suffer only pecuniary harm may justify denial of bail); *United States v. Erickson*, 506 F. Supp. 83, 88 and n. 1 (W.D. Okla. 1980) (court considered pretrial condition ordering defendant not to prepare income tax returns but chose instead to deny bail based on danger to witnesses and pecuniary damage to the community at large); *United States v. Miranda*, 442 F. Supp. 786, 792 (S.D. Fla. 1977) (danger to community not limited to physical harm); *United States v. Parr*, 399 F. Supp. 883, 888 (W.D. Tex. 1975) (pecuniary harm can be basis of detention); *United States. v. Moss*, 522 F. Supp. 1033, 1035 (E.D. Pa. 1981), *aff'd* 688 F.2d 826 (3rd Cir. 1982) (court may refuse bail when defendant poses a pecuniary rather than a physical threat); *United States v. Louie*, 289 F. Supp. 850, 852 (N.D. Cal. 1968) (danger to community provision permits consideration of defendant's propensity to commit crime even where only pecuniary, and not physical harm, might be caused to the community at large).

The United States must establish the defendant is a risk of flight by a preponderance of the evidence, *Motamedi*, 767 F.2d at 1405, and that defendant is an economic danger to the community by clear and convincing evidence, *Reynolds*, 956 F.2d at 192.

## B.    DEFENDANT IS A RISK OF FLIGHT

There is no rebuttable presumption in this case based upon the charges in the First Superseding Indictment. Nevertheless, the preponderance of the evidence below supports a finding that Defendant is a risk of flight, and he should be detained on this basis.

### 1.    Nature and Circumstances of the Offenses Support Detention

As described above, MARION is an organizer of a large-scale international fraud scheme that has spent years defrauding predominantly elderly Americans out of their life savings. MARION not only participated in the scheme, he organized the scheme, took subordinates to a foreign country to meet the foreign organizers, and profited off of almost every dollar of victim funds that flowed through his Southern California cell. Throughout the period of time he was involved in the scheme, it is estimated that tens of millions of dollars were taken from the organization's victims, and MARION and his recruits played

the vital role of immediately sending those funds abroad where the likelihood of recovery was low.

MARION's sentencing exposure underscores the seriousness of the offense. Even if MARION pleads guilty and accepts responsibility, the applicable guidelines range is substantial, and has the potential for a 40-year statutory maximum on Count 1; and a 20-year statutory maximum on Count 2. His guideline range is likewise high:

| | |
|---|---|
| Base Offense Level (2B1.1) | 7 |
| Amount of Loss > $25M - §2B1.1(b)(1)(L) | +22 |
| Substantial Hardship > 25 victims - §2B1.1(b)(2)(C) | +6 |
| Sophisticated Means; Substantial Part of Office Outside US – §2B1.1(b)(10)(A)-(C) | +2 |
| Money Laundering §2S1.1 | +2 |
| Vulnerable Victim §3A1.1(b) | +2 |
| Organizer/Leader §3B1.1(a) | +4 |
| Acceptance of Responsibility §3E1.1(b) | -3 |
| **Total Offense Level** | **42** |
| **Guidelines** | **360 months to life** |

These maximum penalties combined with the applicable guidelines create a powerful incentive to flee, and the foreign nature of the organization and proven willingness and ability to relocate coconspirators abroad makes flight incredibly viable. *See United States v. El-Gabrowny*, 35 F.3d 63, 65 (2d Cir. 1994) ("If convicted . . . defendant will face a probable very lengthy term of imprisonment" which "gives him a great incentive to flee."). The nature and circumstances of the offense are aggravated and weigh heavily in favor of detention. Therefore, this factor weighs in favor of detention.

### 2.   The Weight of Evidence Supports Detention

"Of [the 3142(g)] factors, the weight of the evidence is the least important, and the statute neither requires nor permits a pretrial determination of guilt." *Gebro*, 948 F.2d at 1121. In this case, the substantial evidence against MARION gives him a powerful incentive to flee. As summarized above, the FBI has significant evidence against MARION and his conspiracies including (but not limited to) phone downloads from multiple arrested coconspirators, encrypted communications, financial transactions, videos, pictures,

recorded calls, travel records, and victim accounts. For example, in order to track and control victim funds being laundered through shell company accounts MARION and his primary foreign counterpart would generally create group chats with account holders to directly communicate with them. MARION was, therefore, present and actively engaged in the encrypted group chats facilitating the laundering of many of his codefendants. Surveillance footage from the San Diego Country Recorder's Office also shows MARION with codefendant MUNOZ registering one of MUNOZ's shell accounts in October 2023. And MARION's involvement in the above-described Closer group chat defrauding victims and referring to the activity as a scam clearly shows his intimate knowledge of the fraud.

In sum, the evidence against MARION is overwhelming and he has the incentive and ability to fleee. This factor weighs in favor of detention.

### 3. The History and Characteristics of MARION Support Detention

The Bail Reform Act directs courts to consider, under the heading "history and characteristics of the person," a wide range of factors. Among those are many factors that bear upon whether a defendant is a flight risk, including "family ties," "employment," "financial resources," "length of residence in the community," "community ties," "criminal record," and "record concerning appearance at court proceedings." *See* 18 U.S.C. § 3142(g)(3).

**i.    Character:** MARION's character likewise weighs in favor of detention. MARION is a leader in a multinational fraud and money laundering organization that is responsible for defrauding elderly Americans out of millions of dollars. As a leader and organizer in such an organization, MARION stands to gain the least by staying and facing the charges. Moreover, as reflected in his communications with coconspirator Lejarde displayed above, MARION's immediate reaction was to begin evaluating law enforcement's ability to access phone evidence, and post-arrest, MARION admitted he obtained a PACER account and has been tracking federal charges of individuals he knows. Moreover, MARION did not stop when coconspirators were arrested. Instead, he continued to help build and profit off of the organization's money laundering operations. This factor therefore weighs in favor of detention.

**ii.      Physical and Mental Condition:**  At the time of this filing, the government does not have any information positive or negative regarding MARION's physical or mental condition that would weigh on his ability to make court appearances. This factor is therefore neutral.

**iii.      Family Ties:** The United States understands that MARION had a wife, N.M., who lives in Mira Mesa, CA, with whom MARION shares one child; a girlfriend who lives in Escondido, CA, with whom MARION shares two children; and another girlfriend who lives in Scripps Ranch, CA, with whom MARION shares one child. The United States recognizes that those family ties support bond. However, those ties are somewhat diminished by the fact that one of MARION's above girlfriends may have been aware of the criminal conduct in that she travelled with MARION to Thailand when MARION was there for the purpose of engaging in the above-described criminal activity and is visibly present on club with MARION as he and his coconspirators throw money into the air.

**iv.      Employment:**  MARION's employment history does not support release from custody. The United States anticipates that MARION will claim that he has legitimate employment at Mecca Barbershop as a factor in favor of detention. However, MARION's barbershop was a hub for his criminal organization. For years, MARION has used the barbershop to recruit coconspirators and receive fraud funds via in-person deliveries as well as through mailed packaged. MARION also used the barbershop to hold meetings with coconspirators in back rooms. The fact that MARION used an operational business as part of his money laundering is not unique as criminal organizations often prefer cash-based businesses like a barbershop for the movement and cleaning of illicit proceeds. Illustrative of the fact this "employment" is only minimally legitimate is the fact that several of MARION's charged codefendants were fellow barbers at the barbershop (e.g., Lewis, Abdulbasir, Munoz, and Bagsic) who MARION recruited into the organization and received cuts of their criminal proceeds.

On November 5, 2025, the FBI also executed an arrest warrant at MARION's barbershop. In that search, the FBI located documents confirming MARION is the

registered owner. Investigators also seized an empty glock magazine in a file cabinet in the break room in Mecca Barbershop, which indicates the possibility of firearm presence at MARION's place of employment. In sum, MARION's employment weighs in favor of detention.

Finally, the United States has separate evidence that MARION may have been involved in the distribution of methamphetamine. Specifically, codefendant and former Mecca Barbershop barber Jose MUNOZ is currently charged in a separate indictment in this district (No. 25CR3565-H) with a conspiracy to distribute controlled substances and possession with intent to distribute methamphetamine in relation to a seizure of over 600 pounds of methamphetamine from a vehicle being driven by MUNOZ. In a search of MUNOZ's phone, law enforcement found a group chat created by MARION between MUNOZ, MARION, and MUNOZ's co-defendant in the drug case that law enforcement believes were consistent with MARION hiring MUNOZ to deliver a load of methamphetamine in or around October 2023. In addition to MUNOZ being a barber at Mecca barbershop who is believed to have been recruited into the current scheme by MARION at the barbershop, MUNOZ's codefendant in his drug case frequented Mecca Barbershop in a manner that law enforcement believed was consistent with the use of the barbershop to separately facilitate drug trafficking activity.

**v.      Financial Resources:** MARION's financial resources also weigh in favor of detention. That is because most of the assets MARION has in the United States are believed to be criminally derived and subject to forfeiture. This factor likewise weighs in favor of detention because there is evidence that MARION will have the ability to relocate abroad to foreign countries with financial resources from his foreign coconspirators to do so. In sum, an individual with limited financial assets and substantial foreign ties poses a substantial risk of flight.

**vi.      Length of Residence in the Community/Community Ties:** MARION is believed to be a long-time San Diego resident, as discussed above. That fact weighs in favor of bond. However, in the present case, the United States believes those ties to the

community are an insufficient to secure MARION's presence at a future trial in light of the fact that MARION has engaged in a global fraud scheme in which he maintained near daily communication with foreign organizers, traveled to Asia to commit the fraud, traveled to Mexico consistently in 2024 (where codefendant LARA resides and is believed to have engaged in the scheme), brought coconspirators to Thailand to facilitate the fraud, and may have the ability to relocate his life (and likely his family's lives) at the expense of the organization. LEJARDE—who was also a long-time San Diego resident with his family still present in San Diego—has already proven the organization's willingness to relocate individuals positioned lower in the scheme than MARION and also the willingness of San Diego residents to accept the offer.

**vii.        Past Conduct:**    As described above, the government also believes that MARION has been engaged in ongoing criminal conduct and MARION continually made the decision to keep engaging and growing the conspiracies even after he learned the full scope of the fraud, actively helped close with live victims, and learned of the arrest of conspirators. In fact, at one point, the FBI's investigation indicated that MARION may have informed his foreign counterparts of the FBI's likely investigation, which resulted in those foreign individuals changing their pattern of practice. This weighs in favor of detention.

**viii.        History Relating to Drug or Alcohol Abuse:**    MARION has a criminal history of drug distribution, which the United States believes may have been ongoing. The undersigned understands that MARION admitted post-arrest to being a marijuana user and to previously operating a marijuana dispensary. User amounts of marijuana were seized on November 5, 2025 from MARION's barbershop. Additionally, as referenced above, the United States separately has phone evidence that MARION may be associated with more recent drug trafficking.

**ix.        Criminal History:**  Based on the United States' records, MARION has prior convictions for robbery (1999 – sentenced to 3 years' custody) and manufacturing of a controlled substance (2103 – sentenced to 240 days' jail and 5 years' probation. He has

also been engaging in ongoing largescale international fraud for years and uncharged potential drug trafficking activity, as described above. This factor weighs in favor of detention.

**x.    Record Concerning Appearance at Court Proceedings and on Probation, Parole, or Other Release:** MARION appears to only have been on probation in 2013 and did not have any known violations, although the United States reserves the right to supplement based on the pretrial services report. The United States does not view that limited and dated information to be sufficiently informative of his likelihood of compliance in the present case. This factor therefore should be treated as neutral.

The factors set forth in § 3142(g) support a finding that MARION is a risk of flight. Thus, the court should issue an order of detention on this basis.

## C.    <u>DEFENDANT IS AN ECONOMIC DANGER TO THE COMMUNITY</u>

In addition to being a serious flight risk, there is clear and convincing evidence that MARION poses a danger to the community. This conspiracy involved the targeting of thousands of vulnerable, elderly Americans and was capable of generating millions in fraud funds a month. Many of those victims suffered irreparable economic injury and the loss of their life savings at a critical juncture for its use. Elderly Americans were systematically targeted as part of the scheme. Many of the victims are so old that they cannot return to the workforce and therefore will live with the impact of the loss for the rest of their lives. And by the very nature of the scheme, victims were defrauded in two different forms by the organization—first as a tech support scam and then as a refund scam. The bulk of the money victims lost was also quickly moved overseas by MARION and his codefendants, which means the likelihood that victims will ever see any meaningful restitution is low.

After the March arrest of coconspirators in this district, MARION and his foreign coconspirators predominantly transferred over to Telegram as an encrypted application and—as described above—use sophisticated means of money laundering through shell companies. Even if MARION remained in the United States on bond, he could continue using those techniques to covertly continuing to engage in the fraud. Again, as displayed

through Lejarde's actions, if released from custody, MARION has every ability to continue engaging in the fraud scheme whether that be from the United States (via Telegram and other encrypted apps that MARION has already transitioned to using) or by relocating abroad.

As the Ninth Circuit has recognized, danger to the community may "encompass pecuniary or economic harm." *Reynolds*, 956 F.2d at 192-93; *United States v. Lindsey*, 680 Fed. App'x 563, 567-68 (9th Cir. 2017) (holding that "elaborate mortgage fraud scheme that targeted vulnerable and impoverished individuals" demonstrated dangerousness of defendant to the community); *United States v. Ball*, 2022 WL 229314, at *2 (9th Cir. Jan. 25, 2022) (analyzing danger to the community and affirming denial of compassionate release motion recognizing dangerousness to the community in case involving "telemarketing operation that defrauded elderly consumers of over a million dollars."); *see also United States v. Posey,* 2020 WL 2838793, at *1 (N.D. Cal. June 1, 2020) (Breyer, J.) (denying motion for compassionate release because, under 18 U.S.C. § 3142(g), the defendant posed "a danger to the community if released" where danger was purely economic and defendant had history of "steal[ing] from vulnerable victims").[1] Here, MARION was a member of an organized crime ring that specifically targeted seniors and stole over approximately $40 million confirmed to date. Nor can MARION deny that he was involved in such a scheme—as he was specifically involved in acting as a "Closer" and recruiting others into the organization. Indeed, MARION continued to operate the scheme after returning from Thailand, after helping his codefendants be Closers, and after the arrest of two close associates. In other words, as MARION learned the nature of the fraud and as law enforcement closed in, he continued unabated defrauding elderly Americans. Like Lejarde, he will have every opportunity to relocate to a foreign country,

---

[1] Although *Ball* and *Posey* involve compassionate release motions, such motions require a court to assess a defendant's danger to the community under Section 3142(g). Indeed, both cases cite to the Ninth Circuit's holding in *Reynolds*.

avoid responsibility herein, and continue to exact harm on vulnerable Americans by operating this scheme.

The economic and pecuniary harm caused by MARION and his co-conspirators is an order of magnitude greater than other cases where courts have found danger to the community. Plainly, MARION is a danger to the community and should be detained.

Lastly and by analogy, the law recognizes a rebuttable presumption of danger to the community in felonies that involve *minor* victims. 18 U.S.C. § 3142(e)(3)(E). That is because crimes targeting vulnerable, minor victims are particularly dangerous, involve irreparable damage, and have high levels of recidivism. Those concerns apply similarly to crimes involving vulnerable, elderly victims. As with minor victims, elderly victims are often economically and socially vulnerable, are likely to suffer irreparable injury (from which they may never recover given their advanced ages), and were repeatedly targeted as part of the instant fraud scheme. For each of these reasons, the Court should likewise detain MARION because he poses a danger to the community.

## IV

## <u>CONCLUSION</u>

For all of these reasons, the United States respectfully requests that the Court grant the United States' Motion for Detention of MARION. Thereafter, the Court should order that each Defendant be detained without bail.

DATED: November 5, 2025

Respectfully submitted,

ADAM GORDON
United States Attorney

/s/ *Ashley E. Goff*
ASHLEY E. GOFF
SHIVANJALI SEWAK
Assistant United States Attorneys